IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

| | | |
|---|---|---|
| DAVID CASH MOORE #801362, | § | Hon. Kenneth M. Hoyt |
| WAYNE BAILEY #1129492, | § | |
| MICHAEL EASTERLING #1444209, | § | U.S. Mag: |
| TROY NICHOLSON #1542494, | § | |
| Stringfellow Unit, | § | |
| 1200 FM 655, | § | CIVIL ACTION NO: |
| Rosharon, Texas 77583-8602, | § | |
| | § | |
| -And- | § | |
| | § | |
| ALL SIMILARLY SITUATED INMATES, | § | ORIGINAL COMPLAINT |
| TEXAS DEPARTMENT OF CRIMINAL, | § | REQUESTING DECLATORY JUDGMENT |
| JUSTICE, | § | AND INJUNCTIVE RELIEF |
| Plaintiffs, | § | WITH JURY DEMAND |
| vs. | | |

United States Courts
Southern District of Texas
FILED
OCT 1 9 2010
Clerk of Court

WARDEN JAMES W. MOSSBARGER,
Being Sued in His Individual And,
Official Capacities As Senior,
Warden of Stringfellow Unit,
1200 FM 655,
Rosharon, Texas 77583-8602,

-And-

THOMAS R. DAY,
Being Sued in His Individual And,
Official Capacities As Lieutenant,
of Security Stringfellow Unit,
1200 FM 655,
Rosharon, Texas 77583-8602,

-And-

LARRY D. HODGES,
Being sued in His Individual And,
Official Capacities As Corrections,
Officer IV of Stringfellow Unit,
1200 FM 655
Rosharon, Texas  77583-8602,

-And-

MOISES VILLALOBOS JR.,
Being Sued in His Individual And,
Official Capacities As Safety,
Officer of Stringfellow Unit,
1200 FM 655,
Rosharon, Texas  77583-8602,

-And-

TROY D. FOLLINS,
Being Sued in His Individual And,
Official Capacities As Lieutenant,
Of Security of the Stringfellow,
Unit 1200 FM 655,
Rosharon, Texas  77583-8602,

-And-

CASEY GONZALEZ L.V.N.,
Being Sued in Her Individual And,
Official Capacities As Licensed,
Vocational Nurse of the Stringfellow,
Unit 1200 FM 655,
Rosharon, Texas  77583-8602

-And-

GRIZELDA BOUCHARD A.A.,
Being Sued in Her Individual And,
Official Capacities As Administrative,
Assistant For UTMB,
Stringfellow Unit,
1200 FM 655,
Rosharon, Texas  77583-8602,

-And-

NATASCHA T. DUMAS M.D.,
Being Sued in Her Individual And,
Official Capacities As Medical,
Physician For UTMB Correctional,
Managed Health Care,
301 University Blvd.,
Galveston, Texas  77555-1007,

-And-

PAULETTE H. JOHNSON ANC-P.,
Being Sued in Her Individual And,
Official Capacities As Advanced,
Nursing Practitioner For UTMB,
Stringfellow Unit,
1200 FM 655,
Rosharon, Texas  77583-8602

-And-

UNKNOWN PHYSICIAN OR DIRECTOR,
Being Sued in His/Her Individual And,
Official Capacities As Unknown,
Physician or Director UTMB,
Correctional Managed Health Care,
301 University Blvd.,
Galveston, Texas  77555-1007,

        **Defendants.**

## COMPLAINT OUTLINE

I.  JURISDICTION

II.  PARTIES

III.  IMMUNITES

IV.  FACTS

    A.  Title II Qualified Individuals with Disabilities

        1.  Regulatory Reference 28 C.F.R. 35.104

        2.  **ADA** Amendments Act of 2008 Public Law 110-325

    B.  Substantial Limitation of a Major Life Activity.

    C.  Protected Disabilities

        1.  Plaintiff Moore

        2.  Plaintiff Bailey

        3.  Plaintiff Easterling

        4.  Plaintiff Nicholson

    D.  Discrimination of Disabilities

        1.  July 23, 2010

    E.  Daily Discrimination

        1.  Plaintiff Moore

        2.  Plaintiff Bailey

        3.  Plaintiff Easterling

        4.  Plaintiffs Similarly Situated

    F.  Unconstitutional Custom and Practice

    G.  Inadequate Medical Care

        1.  Plaintiff Bailey

        2.  Plaintiff Moore

        3.  Plaintiff Nicholson

            a.  poor diabetic management

            b.  medical boots/footwear

        4.  Plaintiff Easterling

V.  LEGAL CLAIMS

    Count 1.  ADA-Rehabilitiation Act Violations

    Count 2.  Eighth Amendment Claims:  Cruel & Unusual
               Punishment

    Count 3.  Inadequate Medical Care

    Count 4.  Gross Negligence

COMPLAINT OUTLINE (CONTINUED)

VI.    SUPPLEMENTAL JURISDICTION CLAIMS
           Count 5.   Article I, Section 19, Texas Constitution
           Count 6.   Negligence
VII.   Relief Requested
VIII.  Verification

## I. JURISDICTION AND VENUE

1.  Jurisdiction is conferred upon this Court by 28 U.S.C.
    § 1331 which authorizes Federal Courts to decide cases
    concerning Federal Questions, by 28 U.S.C. § 1343(a) which
    authorizes Federal Courts to hear actions brought under
    42 U.S.C. § 1983, hereafter § 1983.

2.  § 1983 affords a basis for any citizen to present a cogni-
    zable claim for relief against State Actors, if as a result
    of State action, these citizens have been deprived of any
    rights, privileges, or immunities by the U.S. Constitution
    and/or by laws of the United States.

3.  Jurisdiction is further conferred by 28 U.S.C. § 1343(3)(4),
    basis for prison condition complaints. It limits jurisdic-
    tion to deprivations under color of state law of rights,
    privileges, and immunities secured by the Federal Consti-
    tution and acts of Congress.

4.  Jurisdiction is further conferred by Acts of Congress,
    Public Law 101-336 American with Disabilities Act of 1990
    ("ADA"); ADA Amendments Act of 2008 Public Law 110-325
    September 25, 2008; Title II 42 U.S.C. § 12132 et. seq.,;
    Rehabilitation Act of 1973 ("RA") 29 U.S.C. § 794, provides
    Federal protection, and enforcement under the Fourteenth
    Amendment to those individuals with a qualified disability.
    The ADA-RA incorporates cruel and unusual punishment under
    the Eighth Amendment. Congress intended to provide pro-
    tection of disabilities even in prisons, to the maximum
    extent permitted by the ADA-RA, and the Constitution of
    the United States.

5.  Plaintiffs invoke Supplemental Jurisdiction by 28 U.S.C.
    § 1367 which authorizes Federal Courts to decide if State
    laws have been violated. See Section VI. of this Complaint.

6.    Plaintiffs seek declatory relief pursuant to 28 U.S.C. Sections 2201 and 2202. Plaintiffs' claims for injunctive relief are authorized by 28 U.S.C. Sections 2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure.

7.    The Southern District Galveston Division is an appropriate Venue under 28 U.S.C. Section 1391(b)(2) because it is where the events giving rise to this claim occured.

## II. PARTIES

### PLAINTIFFS

8.  Plaintiffs David Moore, Wayne Bailey, Michael Easterling, and Troy Nicholson is and was at all times mentioned herein are prisoners of the State of Texas in the custody of the Texas Department of Criminal Justice-Correctional Institutions Division ("TDCJ"), institution, TDCJ number, and address are listed above and incorporated by reference as if fully printed here.

9.  Plaintiff Similarly Situated Inmates of TDCJ are joined into suit because these issues effects countless men and women confined in Texas Prisons that have qualified disabilities under the ADA-RA who are being violated daily. Further, this plaintiff has medical restrictions linked to such qualified disabilities that are being arbitrarily abrogated by prison officials. Under the Equal Protection Clause of the Fourteenth Amendment, protection of the law is granted to those who are in a similar situation as named plaintiffs.

### DEFENDANTS

10. Defendant James W. Mossbarger is Senior Warden of the Mac Stringfellow Unit, which is being sued both in his individual and official capacities. Acting in his official capacity, Mr. Mossbarger has authority to promulgate Unit policies as permitted by TDCJ, and is responsible for the well-being, and health of every inmate on the Stringfellow Unit. Through duties as Senior Warden, Mr. Mossbarger is conducting business in the Southern District. Through his position as Senior Warden, plaintiffs further joins TDCJ in its entirety, and specifically all executives, agents, and administrators, if through their duties, they

may have any role whatsoever in any matters set forth in this complaint.

11. Defendant Thomas R. Day is Lieutenant of Security at the Mac Stringfellow Unit, which is being sued both in his individual and official capacities. Acting in his official capacity, Mr. Day has the authority to enforce TDCJ rules, and regulations as permitted by TDCJ. Through duties as Lieutenant of Security, Mr. Day is conducting business throughout the Southern District. Through his duties as Lieutenant of Security, plaintiffs further joins TDCJ in its entirety, and specifically all executives, agents, and administrators, if through their duties, they may have any role whatsoever in any matters set forth in this com-plaint.

12. Defendant Larry D. Hodges is Corrections Officer IV of the Mac Stringfellow Unit, which is being sued both in his individual and official capacities. Acting in his official capacity, Mr. Hodges has the authority to enforce TDCJ rules, and regulations as permitted by TDCJ. Through duties as Corrections Officer IV, Mr. Hodges is conducting business throughout the Southern District. Through his duties as Corrections Officer IV, plaintiffs further joins TDCJ in its entirety, and specifically all executives, agents, and administrators, if through theri duties, they may have any role whatsoever in any matters set forth in this complaint.

13. Defendant Moises Villalobos Jr. ("Villalobos") is Safety Officer/ADA Coordinator of the Mac Stringfellow Unit, which is being sued both in his individual and official capa-cities. Acting in his official capacity, Mr. Villalobos has the authority to enforce building safety, and provide ADA-RA accommodation of individual disabilities as provided by TDCJ policies, and ADA-RA provisions. Through duties

4.

as Safety Officer/ADA Coordinator, Mr. Villalobos is con-
ducting business throughout the Southern District.  Through
his position as Safety Officer/ADA Coordinator, plaintiffs
further joins TDCJ in its entirety, and specifically all
executives, agents, and administrators, if through their
duties, they may have any role whatsoever in any matters
set forth in this complaint.

14.   Defendant Troy D. Follins is Lieutenant of Security at
      the Mac Stringfellow Unit, which is being sued both in
      his individual and official capacities.  Acting in his
      official capacity, Mr. Follins has the authority to enforce
      TDCJ rules, and regulations as permitted by TDCJ.  Through
      his duties as Lieutenant of Security, plaintiffs further
      joins TDCJ in its entirety, and specifically all executives,
      agents, and administrators, if through their duties, they
      may have any role whatsoever in any matters set forth in
      this complaint.

15.   Defendant Casey Gonzalez is a Licensed Vocational Nurse
      ("LVN") at the Mac Stringfellow Unit, which is being sued
      both in her individual and official capacities.  Acting
      in her official capacity, Ms. Gonzalez is responsible for
      administration of medical care to inmates of the String-
      fellow Unit, as permitted by Texas law.  Through her duties
      as LVN, Ms. Gonzalez is conducting business throughout
      the Southern District.  Through her position as LVN, plain-
      tiffs further joins TDCJ and University of Texas Medical
      Branch Correctional Managed Health Care ("UTMB"), in its
      entirety and specifically all executives, agents, and admin-
      istrators, if through their duties, they may have any role
      whatsoever in any matters set forth in this complaint.

16.   Defendant Grizelda Bouchard is Administrative Assistant
      ("AA") at the Mac Stringfellow Unit Infirmary, which is
      being sued both in her individual and official capacities.

Acting in her official capacity, Ms. Bouchard is responsible for assisting inmates with health care complaints, administration of the Unit Infirmary, amongst other duties, as defined by UTMB. Through her position as AA, Ms. Bouchard conducts business throughout the Southern District. Through her position as AA, plaintiffs further joins TDCJ and UTMB in its entirety, and specifically all executives, agents, and administrators, if through their duties, they may have any role whatsoever in any matters set forth in this complaint.

17. Defendant Natascha T. Dumas M.D. is a Medical Physician for UTMB, formally attending physician at the Mac Stringfellow Unit, which is being sued both in her individual and official capacities. Acting in her official capacity, Dr. Dumas is responsible for medical care of inmates, and further responsible for Defendant Johnson as defined under Chapter 22 Texas Administrative Code, and other State laws. Through her duties as Medical Physician, Dr. Dumas conducts business throughout the Southern District. Through her position as Medical Physician, plaintiffs further joins TDCJ and UTMB in its entirety, and specifically all executives, agents, and administrators, if through their duties, they may have any role whatsoever in any matters set forth in this complaint.

18. Defendant Paulette H. Johnson is an Advanced Nursing Practitioner ("ANP") for UTMB at the Mac Stringfellow Unit, which is being sued both in her individual and official capacities. Acting in her official capacity, Ms. Johnson is responsible for medical care of inmates at the Mac Stringfellow Unit, as allowed under Texas law. Through her duties as ANP, Ms. Johnson conducts business throughout the Southern District. Through her position as ANP, plaintiffs further joins TDCJ and UTMB in its entirety, and specifically all executives, agents, and administrators, if through

their duties, they may have any role whatsoever in any matters set forth in this complaint.

19. Defendant Unknown Physician or Director is an individual unknown to plaintiffs that has final authority to determine if an inmate can undergo surgical procedure at UTMB John Sealy Hospital Galveston. Once this individual or entity is known, plaintiffs will amend complaint to reflect such individual or entity. Through his/her duties as Unknown Physician or Director, this individual is conducting business throughout the Southern District. Through his/her duties as Unknown Physician or Director, plaintiffs further joins UTMB in its entirety, and specifically all executives, agents, and administrators, if through their duties, they may have any role whatsoever in any matters set forth in this complaint.

20. Each Defendant's address is listed above, and referenced and inserted into this complaint as if fully printed here. At all times mentioned in this complaint each defendant acted under the color of state law.

7.

## III. IMMUNITIES

21. Defendants in this cause of action, are not entitled to "any" immunities for knowingly violating known Federal law and acts of Congress. The below supports plaintiffs' contentions.

22. For Eleventh Amendment Immunities:

    A state shall not be immune under the Eleventh Amendment to the Constitution of the United States from an action in Federal or State Court competent jurisdiction for a violation of this Act. In any action against a State for a violation of the requirements of this Act, remedies (including remedies both law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

    See 42 U.S.C. Section 12202 ADA Act of 1990.

23. The term "public entity" means
    (A) any State or local government;
    (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; ...
    See 42 U.S.C. Section 12131.

24. The Court held: (1) application of ADA Act to State prisons was constitutional exercise of Congress' Fourteenth Amendment enforcement powers, and (2) sovereign immunity was not available to State. See Amos v. Maryland Dept. of Public Safety, 178 F.3d 212 (4th Cir. 1999).

25. **Qualified Immunities:** A governmental employee who is sued for a constitutional violation pursuant to § 1983 may assert the affirmative defense of qualified immunity. White v. Taylor, 959 F.2d 539, 544 (5th Cir. 1982). Qualified immunity protects government officials performing discretionary functions from suit and liability for civil damages

to the extent their conduct does not violate clearly estab-
lished statutory or constitutional rights of which a rea-
sonable person would have known. <u>Harlow v. Fitzgerald</u>,
457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed. 2d 396 (1982).
The doctrine protects "all but the plainly incompetent
or those who knowingly violate the law." <u>Malley v. Briggs</u>,
475 U.S. 355, 341, 106 S.Ct. 1092, 89 L.Ed. 2d 271 (1986).
Whether the conduct of which the plaintiff[s] complains
violated clearly established law is essentially a legal
question. <u>White</u> 959 F.3d at 544.

Plaintiffs must present specific facts to defeat the
claimed immunity. <u>Nunez v. Simms</u>, 341 F.3d 385, 388 (5th
Cir. 2003).

26. Plaintiffs argue that the evidence presented with Original
Complaint, and Memorandum of Law In Support of Original
Complaint, defeats claim of qualified immunities. Evidenc-
ing, these defendants are trained in regards to the ADA-
RA, knew the established law, and intentionally disregarded
the law.

27. Medical physicians, and Nursing Practitioners are trained
to administer medical care appropriate with modern medical
sciences, and intentionally disregarded plaintiffs serious
medical needs in the face of cost. Qualified immunities
will not protect the incompetent medical care received.

28. During the time of the ongoing violations of constitutional
rights, violations of Congressional Statutory laws (ADA-
RA), inadequate medical care of ADA-RA disabilities, these
defendants were well-aware of their conduct, and the law
is clearly established.

## IV. FACTS

A. Title II-2.0000 Qualified Individuals With Disabilities.
   1. Regulatory Reference: 28 C.F.R. 35.104
   2. ADA Amendments Act of 2008 Public Law 110-325

29. Title II of the ADA prohibits discrimination against any **"qualified individual with a** disability." **Whether a parti**-cular individual is protected by Title II requires a careful **analysis** first, of whether an individual is an "individual with a disability," and then whether that individual is "Qualified."

30. **Title** II protects three categories of individuals with disabilities:
   1) Individuals who have a "physical" or "mental" impair-ment that substantially limits one or more major life activities;

   2) Individuals who have a record of a "physical" or "men-tal" impairment that substantially limited one or more of the individual's major life activities; and

   3) Individuals who are regarded as having such an impair-ment, whether they have the impairment or not.

31. The first category of persons covered by the definition of an individual with a disability is restricted to those with "physical or mental impairments." Physical impair-ments include:
   1) Physiological disorders or conditions;

   2) Cosmetic disfigurement; or

   3) Anatomical loss

affecting  one or more of the following body systems: neuro-
logical;  musculoskeletel; special sense organs (which would
include  speech  organs  that  are  not  respiratory such as
vocal cords, soft palate, tongue, etc.); respiratory, inclu-
ding speech organs; cardiovascular; reproductive; digestive;
genitourinary; hemic and lymphatic; skin; and endocrine.

32.   Major  life  activities  include,  but  are  not limited to,
      caring  for  oneself, performing manual tasks, seeing, hear-
      ing,  eating, sleeping, walking, standing, lifting, bending,
      speaking,  breathing,  learning,  reading,  concentrating,
      thinking, communicating, and working.

## B. Substantial limitation of a major life activity

33.   The  determination  of  whether  an impairment substantially
      limits  a  major  life activity shall be made without regard
      to  the  ameliorative  effects  of  mitigating measures such
      as--Medication,  medical  supplies,  equipment,  low-vision
      devices (which do not include ordinary eyeglasses or contact
      lenses),  prothetics  including  limbs  and devices, hearing
      aids  and  cochlear  implants  or  other implantable hearing
      devices,  mobility  devices,  or  oxygen  therapy  equipment
      and supplies.  Sec. 3(A)(4)(E)(i)(I).  42 U.S.C. § 12102.

34.   Mental  impairments  include mental or psychological disorders
      such  as  mental  retardation,  organic brain syndrome, emo-
      tional  or  mental  illness, and specific learning disabili-
      ties.

35.   Title  II of the American With Disabilities Act, 42 U.S.C.S.
      §  12131  et  seq.,  is  enforcable  through a private cause
      of  action,  and  to  make a prima facie case under Title II
      a  plaintiff  must  show: (1) that he has a qualified disa-
      bility; (2) that he is being denied the benefits of services
      programs,  or  activities  for  which  the  public entity is

11.

responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability.

36.  Plaintiffs allege inter alia, each plaintiff herein, does have a protected disability under the ADA-RA. Plaintiffs' disabilities substantially limits major life activities.

37.  The term "substantially limits" means, among other thing, "[u]nable to perform a major life activity that the average person in the general population can perform.

38.  Plaintiffs' protected disabilities have particular individual conditions proscribing lifting, bending at the waist, and so forth, to prevent further damage or injuries to plaintiffs' person. These proscribed limitations are identified in the form of "medical restrictions" applied by UTMB medical professionals.

C. Protected Disabilities
   1. Plaintiff Moore

39.  Moore has both, an umbilical, and epigastric hernia that affects the ability to lift, and care for personal needs. This effects Moore's quality of life not being able to perform manual tasks such as lifting, and working. Any breach of Moore's medical restrictions risks further harm, and injury to Moore's digestive system and/or bowel. See Exhibit H.

40.  Moore also suffers from Colitis, which effects Moore's ability to care for personal hygene needs. Colitis is a protected disability under the ADA-RA;

41.  Further, Moore suffers from "Sleep Apnea" a breathing disorder requiring the use of a breathing machine. This af-

12.

fects Moore's ability to breathe, also a protected disa-
bility under the ADA-RA.

42. Moore's hernias admittingly could be a temporary impairment,
however, due to cost, UTMB refuses to provide Moore with
surgical procedure, which would improve Moore's quality
of life.

43. Moore's impairments require accommodation by the public
entity TDCJ as required for each individual impairment,
that substantially limits major life activities.

## 2. Plaintiff Bailey

44. Bailey is more than 40 percent deaf in both ears due to
tinnitus "ringing of the ears" affecting Bailey's ability
to hear. Bailey requires the use of a hearing aid.

45. Bailey was rated by the Washington State Department of
Labor & Industries, being 45 percent disabled following
decompressive laminectomy for a herniated disc, and severe
lumbar stenosis 08/17/1993. Bailey is required to perform
work functions in a sedentary line of work to avoid reinjury
of Bailey's spine.

46. In the year 2003 at the French Robertson Unit, Bailey is
reinjured because Doctos Nafarwi and Peck refused to give
proper medical restrictions.

47. Bailey has significant problems walking, climbing, sitting,
lifting, bending, and tending to personal care needs. In
fact, officers physically carried Bailey up stairs after
losing the ability to walk on Bailey's left leg.

48. In 2006 while at the Wynne Unit, Bailey again lost the
ability to walk, affecting Bailey's left leg, thigh going

13.

numb, and Neuropathy/Sciatica causing intense pain.

49. Bailey is referred to John Sealy Orthospine Clinic, and an MRI is ordered by Dr. Stanley Allen M.D.

50. On December 11, 2006, Bailey receives the MRI at John Sealy Hospital Galveston that revealed:

At the L1/L2 level, degenerative disc disease and a bulging annulus result in moderate spinal canal stenosis with and bilateral **neural foraminal narrowing**.

At the L2/L3 level, degenerative disc disease and a bulging annulus result in mild spinal canal stenosis without neural foraminal narrowing.

At the L3/L4 level, bulging annulus and facet hypertrophy results in moderate spinal canal stenosis and bilateral **neural foraminal narrowing**.

At the L4/L5 level, bulging annulus and facet hypertrophy result in **left neural foraminal narrowing** without spinal canal stenosis.

At the L5/S1 level, facet hypertrophy results in no significant canal stenosis or neural foraminal narrowing.

Dated 12/14/2006 UTMB John Sealy. See Exhibit A.

51. Degenerative Disc Disease is a musculoskeletel disorder, also known as Diskogenic low back pain; neural foraminal narrowing is a neurological disorder where any of the 31 nerve roots pairs are being compressed, which causes pain, Sciatica, leg weakness, and numbness.

52. Bailey has a permanent "physical" impairment affecting

14.

the Neurological, and Musculoskeletel systems, which sub
stantially limits Bailey's ability to lift, bend, walk,
climb, sitting for prolonged periods, work, and care for
personal needs.

53. Bailey's disability is protected under the ADA-RA, and
is required to be accommodated by public entity TDCJ, and
TDCJ employees.

54. On November 10, 2009, a nerve conduction test is performed
by Dr. Glen Smith M.D. PhD., that yielded results supporting
¶ 51, indicating nerve denervation moderate at L4 level,
mild at L3 level, where the 1993 surgical procedure occured.

55. Dr. Smith recommended evaluation by surgical service for
treatment options may be considered. Radio Frequency Abla-
tion may be an option for long term left leg pain control,
if other options are not available. Concluded by Neurology
on November 10, 2009. This consideration was "never" evalu-
ated by Neurology.

56. On August 17, 2010 Bailey underwent another (third) Epi-
deral Steroid Injection to lumbar levels L3-L4, and devel-
oped nerve damage complications on August 18, 2010, yet
as of September 21, 2010, is left untreated by "any" doctor,
or specialist.

### 3. Plaintiff Easterling

57. Easterling Suffers from a psychological disorder known as "Post Traumatic Stress Disorder" ("PTSD"). Easterling's PTSD is an emotional or mental illness under the ADA-RA substantially limiting major life activities that include: walking, working, and learning.

58. Easterling reported side effects from the medication Ster-line many times to the medical department. This affects Easterling's ability to walk, because of cramping of the legs is a known side effect of this medication, as well as dizziness, and blurred vision.

59. Easterling's protected disability is permanent, and is required to be accommodated by public entity TDCJ, and TDCJ employees.

### 4. Plaintiff Nicholson

60. Nicholson was involved in a Bus accident involving TDCJ's employee's negligence. Nicholson was transferred from Unit to Unit so Nicholson could not file a claim against the serious injuries Nicholson suffers from. This is known as "Diesel Therapy" by the Courts.

61. Nicholson has a herniated disc at cervical level C4-C5, nerve damage, and neural sac compression affecting the spinal cord, and Nicholson's ability to walk, lift, bend, and care for personal needs.

62. Nicholson is a Type 1 Diabetic which is a "physical" impair-ment under the ADA-RA. Nicholson's diabetes affects the ability to walk, feel Nicholson's feet, due to diabetic complications known as Neuropathy.

63.  Nicholson's protected disabilities are permanent affecting
     Nicholson's neurological, musculoskeletel systems, which
     substantially limits Nicholson's ability to lift, bend,
     walk, climb, work, and care for personal needs. Due to
     complications of Nicholson's diabetes, Nicholson suffers
     from high blood sugar levels affecting Nicholson's nervous
     system (diabetic neuropathy), cardiovascular (congestive
     heart failure), and eyes.

64.  Nicholson's impairments are permanent requiring accommo-
     dation by public entity TDCJ, and TDCJ employees.

## D. Discrimination of Disabilities

65. On July 21, 2010, Moore, Bailey, and Nicholson approach Villalobos showing Villalobos their actual HSM-18/HS-05 ("HSM") printouts, which clearly shows medical restrictions /proscriptions such-and-such pounds lifting, no bending at the waist, and so forth. See Exhibits B, C, F, and G.

66. Villalobos examines the HSM documents (drawing the inference necessary for Eighth Amendment subjective knowledge test), by telling Bailey, "Take what you can and leave the rest" specifically referring to Bailey's property.

67. Villalobos told Moore, at first, "Take this to Lieutenant Day and show him, he's in charge" thereafter, defendant Day says, "Oh those only apply when you're at work, not a shakedown."

68. Defendant Day has been employed by TDCJ for so many years, there is no way possible Day can be ignorant of the fact, medical restrictions "apply at all times." See Exhibits N and O.

69. Bailey asked Unit Health Administrator P. Henry of the Wayne Scott Unit on April 29, 2009 this question: "Are these medical restrictions, to apply at "all" times? Ms. Henry responds, "Attached is a list of your restrictions. Yes they apply "all times" to work restrictions." Exhibit N.

70. On January 3, 2010, Bailey asks this same question to Johnson. Defendant Johnson replies, "Update and compliance at all times." Exhibit O.

71. Plaintiffs argue that Villalobos, Day, and Hodges knew

knew how medical restrictions applied, and disregarded them.

72. Villalobos examines Nicholson's HSM document proscribing: No lifting > 10 pounds; No bending, no repetive squatting; no climbing. Villalobos did nothing. See Exhibit F.

73. Plaintiffs are now on their own, despite HSM documents.

74. Bailey carries two light mesh bags of property to the wall of A-Corridor hallway. Then goes back for the other two heavier bags of property, also placing them by the wall.

75. Defendant Hodges asks, "What are you waiting for?" Bailey responds, "I am waiting for Mr. Villalobos the Safety Officer to place these two bags (pointing at the heavy bags) on the cart for shakedown." Hodges says, "No you're not." Bailey said, "I have medical restrictions and a spinal condition." Hodges retorts firmly, "Here comes the man who can lock you up."

76. Thereafter, defendant Day approaches, and Bailey calmly explains the same to Day. Defendant Day said, "Medical restrictions only apply at work." Bailey emphasized, "No they apply at all times according to medical, and I have a spinal condition--I cannot lift more than twenty-five pounds." Without Day responding, Bailey tells Day that the issue will be grieved, Day snaps back and said, "Go ahead write it up bitch!"

77. Under threats by Day and Hodges of being locked up, Bailey is forced to make two trips to the gymnasium leaving property unattended risking theft, and injury to Bailey.

78. Moore promptly return to Villalobos pleading to instruct Day that medical restrictions apply at all times, after Day deliberately abrogates Moore's contention that medical

restrictions apply at all times.   Villalobos did nothing.

79.   Defendant  Hodges stands behind a large flat cart with eight
      storage  containers.   These  metal  containers are used for
      offender  property,  or  legal materials.  Considerable room
      exists for offender property.

80.   The  distance  to  the gymnasium from A-Wing corridor is the
      equivilent of walking a football fields distance.

81.   Defendant  Hodges made "no" effort to accommodate plaintiffs
      disabilities.

82.   Meanwhile,  Nicholson  physically  drags  personal  property
      from  A3-dormitory  down  the  corridor towards the offender
      dining  room.   Upon  reaching  the  door  to B-Wing, by the
      officers dining room, an offender begins to assist Nicholson
      taking property to the gym.

83.   Nicholson  is being yelled at to get down the hallway, while
      sorting out property to carry down the hallway.  Once start-
      ing  the  process of carrying property to the gym, Nicholson
      became  aware  exceeding  physical  limitations  is  causing
      Nicholson pain.

84.   The  gymnasium  is  very  hot,  in  excess of 95° F, there is
      "no"  air  circulation  for  offenders,  while officers are
      being  supplied  with  fans, cold water, and ice.  Offenders
      have  "NO"  cold  water  to drink, "NO" ice, and "NO" air to
      keep  temperatures  at  a  reasonable level.  Similar to old
      prison sweat boxes used for cruel punishment.

85.   At  least  one  offender  suffered  heat  stroke, while many
      others suffered from heat exaustion, and dehydration.

86.   No accommodations were made for plaintiffs disabilities.

87. Adding further pain, Bailey is forced to load Bailey's metal storage container. This container weighs, even without contents, easily in excess of twenty-five pounds.

88. This severely exacerbates Bailey's spine, left and right legs, right hip, and causing spasms in lumbar L3/L4. Bailey experiences sharp shooting pain in the right hip with the extra weight.

89. After shakedown, Moore approaches Sergeant DelBosque (witness) to clairify the interpretation of the HSM form. This is to firmly discover what DelBosque's training indicates, how to handle Moore's five pound HSM medical restrictions. DelBosque states that the medical restrictions apply at "all" times, not just for the purposes of work assignment, or, "at" work assignments (Emphasis Added).

90. On the return trip, Bailey did manage to place both heavy bags of property on the same cart defendant Hodges was holding in the A-Wing cooridor. Hodges offers no explanation for the sudden change.

91. Once again, Moore conferred with defendant Hodges whether Moore could place personal property on the cart, along with others' now on top of metal storage containers. Moore is being singled out by defendant Hodges for discriminatory enforcement telling Moore, "Legal boxes only on the cart."

92. When Sergeant DelBosque asks Moore, "Why didn't you put your property on top of the cart, like everybody else?" Hodges standing there, Moore tells DelBosque, pointing to Hodges, "He told me 'legal boxes only.'" When in fact, Hodges lies to the Sergeant by saying, "I told you legal boxes 'first' then you could've put your property on there."

93.  Obviously, Hodges has subjective knowledge of the correct policy, like Day, yet Hodges decides to enforce "Hodges" rules over inmates' disabilities, safety and health.

94.  Bailey filled out an inmate sick-call request form (HSA-9) informing the infirmary of the shakedown incident, and that Bailey is experiencing pain due to the stress that was placed on Bailey's torso.

95.  Likewise, Nicholson also filled out the sick-call request form informing the infirmary of the pain Nicholson now is in.

96.  Accommodation of plaintiffs' disabilities would have required nothing more than having a "Service Support Inmate" or "SSI" as referred to in prison, assist offenders with their property; placing property on/off the cart, also when returning to their living areas.

97.  These SSI's were already assisting Day and Hodges. Plenty of room existed on the large flat cart. Therefore, little effort was needed to accommodate disabled offenders.

98.  Administration can printout offenders medical restrictions in the form of a roster, listing the offenders, TDCJ number, housing location, and medical restrictions.

99.  This accommodation will not interfere with institutional security or the "shakedown" process. In fact, it would help provide efficiency in the process by moving disabled offenders promptly, without risking further injuries.

100. The term "reasonable accommodation" in ADA does not mean only effective accommodation, so as to authorize Court to consider requested accommodation's ability to meet an individual's disability-related needs and nothing more. See

ADA Act of 1990, § 101(a)(B); 42 U.S.C. § 12111(9)(B). And;

101. [N]ot making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability, unless, such covered entity can demon-strate that the accommodation would pose an undue hardship (only an excuse from TDCJ because rosters of offenders are printed every day) on the operation of the business of such covered entity. Is discrimination.

102. Consider Exhibits B-G, the HSM forms. The form's purpose is to insulate offenders from further injuries as a result of their physiological or psychological disorders, condi-tions, surgeries, certain medications' adverse effects under certain conditions, temperature extremes, and so forth.

103. In other words, the HSM (HEALTH SUMMARY FOR CLASSIFICATION), is what physicians in the medical department use to auto-nomously communicate to TDCJ security staff and classifi-cation department, offenders' medical limitations an offen-der has. Often this is directly linked to disabilities.

104. An examination of Exhibit D shows offender Sills is perm-anently "medically unassigned," i.e., this is what the double "00" indicates. If there is a number, say 10 for instance, this would mean a "ten-day" restriction. And;

105. If medical restrictions "only" apply at work as Day and Hodges claim, why would medical personnel give additional restrictions? If this truly is the case, medical would only apply restrictions number one, "Medically Unassigned," omitting other restrictions altogether.

106. On the other hand, there are "some" restrictions that can "only" apply in regards to work. These are specifically indicated as stating, "NO WORK ..."

23.

107. The ambiguous language on the HSM form in Section III, where it reads, "WORK ASSIGNMENT/RESTRICTIONS." Some Officers (usually inexperienced officers) in haste, interpret this to mean "WORK ASSIGNMENT" only restrictions. When the "/" forward slash means and/or.

108. To correct ambiguity, the form could simply read "MEDICAL RESTRICTIONS or "WORK ASSIGNMENT AND MEDICAL RESTRICTIONS."

109. Nevertheless, this is no excuse, or defense to liability, if Sergeant DelBosque knew the correct application of medical restrictions, so did Day, Hodges, Villalobos, and other officers.

110. Plaintiffs are vexed by, and suffer emotional, and mental injuries in light of knowledge of the malicious acts concerted by such a large contingent of officers who have been ostricised by training at academies of TDCJ to ignore the human rights of prisoners, seemingly, to inflict pain and suffering, shocking to the consciousness under evolving decency standards of society.

1. July 23, 2010

111. On July 23, 2010, defendant Day is on the run when the cell doors open. Easterling is told firmly, as well as every other offender, "Get your stuff-get to the gym-or else you're going to one row for disobeying an order." Day barks. In other words, you are going to lock-up.

112. Not wanting to be placed in lock-up, Easterling grabs the items packed, struggling down the stairs to the gymnasium for shakedown. Notably, carrying this property is very difficult due to Easterling's legs being weakend from known side effects of Easterling's medication.

24.

113. Similar to other plaintiffs herein, Easterling is provided no accommodation during shakedown. The medical department is aware of Easterling's medication side-effects. Appropriate medical restrictions were applied on the HSM document.

114. After shakedown is completed, Easterling is again coerced into physically carrying all of Easterling's property up the stairs to the third row. Suddenly, Easterling falls backwards from the third or fourth step from the top, tumbling backwards down the stairs to the second row.

115. Easterling suffered a broken right arm, multiple contusions to the head-left hand, and a concussion.

116. Easterling is taken to the infirmary at approximately 8:50am where X-rays are taken for confirmation of injuries.

117. Meanwhile, at approximately 9:45am, Bailey notifies the Officer on duty in A3-Dorm, that Nicholson cannot get out of the bunk.

118. Defendant Gonzalez places a splint on Easterling's broken right arm. Gonzalez calls a physician for consultation, subsequently, giving Tylenol 3 for pain. No other emergency medical attention is given.

119. Defendants Gonzalez nor Bouchard (present in the infirmary), made no effort to call "911" to request emergency transport for a serious medical need. Easterling is left to suffer the effects of Easterling's injuries.

120. Approximately 11:30-11:45am, Nurses Casiano, and Gonzalez appear with a stretcher, and a backboard in A3-Dorm.

121. Nicholson is lifted by five inmates, which places Nicholson backwards on the backboard. Subsequently, Nicholson is

25.

strapped to the stretcher, without Nurse Casiano, or defen
dant Gonzalez noticing Nicholson is on the backboard back-
wards, causing further pain. Thereafter, Nicholson is
taken to the infirmary.

122. Defendant Johnson is present in the infirmary, and has
no clue why Nicholson is unable to walk. Johnson orders
Nicholson transported to Angleton Danbury General Hospital.

123. Defendant Johnson makes no effort to attend to Easterling's
injuries, or give Easterling anything for pain.

124. Easterling is still suffering from pain around 4:30pm or
5:00pm. No efforts are made later, to transport Easterling
to Angleton Hospital. Alleging here, because staff did
not exist to transport Easterling-due to Nicholson having
three officers at Angleton Hospital already.

125. Around 6:00pm defendant Follins comes into the infirmary
to take pictures of Easterling's injuries. Follins asks
Easterling how this happend, Easterling responds by saying,
"I just did what your officers told me to do."

126. Shortly thereafter, Easterling is denied any further treat-
ment, and is moved to B-Wing housing. Easterling loads
all personal property with a broken arm into a cart, then
is forced to push this cart to B-Wing, being denied assist-
ance by Follins, despite knowledge of Easterling's injuries.

127. Defendant Follins made no attempt to have someone assist
Easterling, such as an "SSI" inmate.

128. Nicholson is seen by Dr. Johnson, and another unknown named
physician in the emergency room at Angleton Hospital. The
physicians ordered a Computerized Tomography Scan (See
next page note 1), blood tests, and other diagnostic test.

Nicholson like Moore and Bailey, suffers exacerbated effects that causes pain and suffering.

129. On July 26, 2010, Easterling refuses medical chain to the Estelle Unit for an Optometrist appointment. Defendant Bouchard gives this instruction to Easterling because the next day, Easterling would be going to John Sealy Hospital.

130. Easterling is written a disciplinary offense for refusing medical chain.

131. This policy or practice is not authorized by TDCJ Director Rick Thaler, or any other written TDCJ policy. Defendant Day finds Easterling guilty despite Bouchard's direction: disregarding serious medical needs.

132. On July 27, 2010, Easterling is finally transported to John Sealy Hospital in Galveston where the arm is set, and a cast applied. A four (4) day delay in medical care.

133. Upon information and belief, Easterling is not transported immediately, or even later, due to staff shortages, causing Easterling further unnecessary complications.

134. The acts and omissions by defendants Gonzalez, Johnson, Bouchard, and Follins are not simple negligence. This is complete disregard for Easterling's serious medical needs.

135. Immediate transport would have relieved Easterling of pain, and suffering, reducing risk of further complications.

---

1. Computerized axial Tomography "CAT-SCAN" is a radiography in which a three-dimentional image of a body structure is constructed by computer from a series of cross-sectional images along an axis.

136. In fact, no offenders who have disabilities were accommo-
dated during this institutional shakedown. Notably, Eddie
McCabe an offender at the Stringfellow Unit, has Harrington
Rods in the back, with a fractured spine, also is refused
any accommodation or assistance.

137. The level of inhumanity within the Stringfellow Unit, and
the Texas Prison System simply shocks the consciousness.
A good majority of the offenders on the Stringfellow Unit
are either physically or mentally handicapped.

138. Pushing offenders beyond their physical limitations is
torture, inflicting wanton pain and suffering, which states
a claim for deliberate indifference to serious medical
needs.

139. Factors that play a significant role in this issue are
staff shortages, and the classification process.

140. Staff shortages contribute to lack of accommodation of
disabilities, because everything in prison is based upon
time schedule. Officers are more concerned with keeping
on schedule, then accommodating an offenders disability
or serious medical needs, due to time.

141. This is why Defendant Day, Hodges, and Villalobos made
fictitious reasoning not to accommodate offenders during
shakedown. Furthermore, these Defendants used their auth-
ority as an instrument of oppression, to will offenders
into obedience, causing physical injury to offenders.

142. Next, the Classification process knows exactly what medical
restrictions offenders have. Classification intentionally
places disabled offenders in environments where they can
be assaulted or extorted. For instance, placing a 71 year
old man in the same dorm or cell block, with a 26 year
old man. This creates a situation where the man can be

28.

extorted or assaulted. This occurs due to overcrowding. This happens to be the case on the Stringfellow Unit, or any other TDCJ prison.

143. Similarly, classification could give officers a printout of medical restrictions to identify offenders who have disabilities. This printout contains the offender name, TDCJ number, housing location, and medical restrictions. This practice is completed everyday for work rosters, but not for shakedown. The objective component of deliberate indifference becomes more obvious; because subjectively, officers in work areas are aware of medical restrictions, being further aware officers are not to violate them; having to act objectionably reasonable due to the risk of harm officers are trained to be aware of.

144. A reasonable jurist could consider that not using rosters to identify disabled prisoners is objectionably unreasonable, due to the risk of harm disabled prisoners face in light of physical limitations.

145. Defendants Mossbarger, Day, Villalobos, and Hodges did not act objectionably reasonable with regards to ADA-RA disability accommodations, because these defendants did not adhere to TDCJ policy (¶177), and properly accommodate plaintiffs.

146. The medical department freely gives HSM printouts to inmates upon request, the same printouts shown to Villalobos, Day, and Hodges. A reasonable jurist also could consider why reasonable accommodations were not even attempted after plaintiffs assertions of a disability that required accommodation. In light of the intent of public entity TDCJ that these Defendants "should have" been aware of.

29.

E. Daily Discrimination
    1. Plaintiff Moore

147. Under the ADA the term "discriminate" includes not making
     reasonable accommodations to the known physical or mental
     limitations of an otherwise qualified individual with a
     disability unless, such covered entity can demonstrate
     that the accommodation would impose an undue hardship on
     the operation of the business of such covered entity. See
     42 U.S.C. § 12112(b)(5)(A).

148. Plaintiff Moore has "Colitis" (Section C(1)¶40), which
     affects Moore's ability to care for personal needs. Moore
     received a medical pass to use the 'center hall' or 'turn-
     out' restroom located across from the medical department.

149. Medical issued this pass in relation to Moore's Colitis
     because Moore cannot hold the bladder, or bowels like other
     individuals in the general population.

150. Defendants Mossbarger and Day directly discriminated against
     Moore when Day confiscated Moore's medical pass to use
     the 'turnout' restroom. This denied Moore's disability
     accommodation.

151. Furthermore, Moore urinated on himself, and received a
     disciplinary offense for not submitting to a pat search,
     when Moore held urine for a length of time, pain and suffer-
     ing results, consequently being forced to relieve Moore's
     bladder. See Exhibit L.

152. Defendants Mossbarger and Day interfered with medical orders
     for non-medical reasons, when defendant Day tore-up/confis-
     cated Moore's medical pass. Then, Mossbarger calls Moore
     into the Captains Office, shouting, "You're not going to
     run my Unit!"

153. Other than the 'turnout' bathroom, no central bathrooms exist on the Stringfellow Unit. All bathroom facilities exist only in living areas of the Unit.

154. Moore has "no" accessable restroom while moving about the Unit. The medical department provided a valid pass to accommodate Moore's disability.

a. Past Discrimination Against Moore

155. Moore could not obtain an extra roll of toilet paper, even though Moore possessed a valid medical pass. See Exhibit I and C2. Moore is forced to "purchase" the extra roll of toilet paper, because the inmate that passes out necessities during third shift, refused Moore the extra roll. Further denied by the inmate's supervisor.

156. On November 2, 2009 Moore sent a communication to classification concerning threats of harm by a staff member. The letter detailed information concerning all the disciplinaries Moore received concerning Moore's disability. The letter reads in pertinent part:

"It should be obvious that inmates retain their right to bodily integrity even in prison. It is clearly established law that prison officials must 'put forward' legitimate governmental interest to justify regulation impinging on constitutional right to inmates and must provide evidence that interest proffered is reason why regulation is adopted or enforced. (107 S.Ct. 2254). ..."

"Specifically, I've just received a disciplinary that should, based upon the evidence I presented to Lt. Douglas/ Captain Zarate, be overturned, whereas, Lt. Villareal stated openly, "I don't care about your medical needs." And intentionally ordered me to submit to a pat search that Ms. Jones had already excused me from ..."

157. On December 31, 2009 Moore sent a detailed I-60 (known as a "kite") to the Safe Prisons Coordinator Sergeant Walter Ward, concerning the policy posted by defendant Mossbarger denying offenders the use of the Law Library restroom.

158. Moore Specifically states, "According to the policy, above, I was supposed to have been allowed to leave the law library to use the bathroom. Instead, I was forced to remain in the law library for 15 minutes past the expiration of the session, due to count not being cleared. During this time, I was in extreme pain from having to hold in my bodily wastes. The Correctional Managed Health Care Policy Manual Number A-03.1, entitled Medical Autonomy, "Policy," reads:

    Decisions and actions regarding the health care services provided to offenders are the sole responsibility of qualified health care personnel ..."

159. Obviously, defendant Mossbarger discriminated against Moore by not providing accommodation. Notably, Sergeant Ward provided no assistance. The Stringfellow Unit was built pre 1940, with additions being added subsequently. The law library bathroom is the only accessible bathroom Moore could use.

160. Mossbarger and Day intentionally eliminated Moore's ability to relieve bodily waste. This places stress on Moore's colon, bladder, and the Colitis is exacerbated as a result causing pain, and suffering.

161. Under the ADA-RA, the fact that unusual accommodations may be necessary, in light of Moore's special needs, to accomplish the provision of minimal conditions of incarceration does not absolve prison officials of their duty towards handicapped inmates.

32.

162. Moore is required to use a breathing machine for "Sleep Apnea" a protected disability under the ADA-RA. Moore requested a new air-filter for Moore's breathing machine ("CPAP"). The air-filter is required to be changed out after so many hours of usage. This ensures the air Moore is breathing is filtered, not breathing in impurities into Moore's lungs.

163. On 03/26/2010, Moore is given a medical pass to speak to Ms. Taylor about obtaining a new air-filter. See Exhibit U. Moore is told the air-filter Moore received is a correct air-filter.

164. In fact, the air-filter Moore received is an air-conditioner air-filter. Ms. Taylor cut Moore out an air-filter to fit the CPAP Unit. Moore's throat becomes sore, unknowingly to Moore, possibly causing lung damage. See Exhibit V.

165. Moore specifically documents in sick-call requests that the air-filter is incorrect, being provided no explanation by medical supply. See Exhibits W & W1.

166. Upon information and belief, this deliberate act of giving Moore an air-conditioning "fiberglass" homemade filter, instead of the designed CPAP air-filter is due to cost.

167. The Texas Legislature openly stated that TDCJ will cut back 5 percent of budget operating expenses, and some 384 UTMB personnel from prison infirmaries, and other medical personnel. This is directly affecting quality of care issues, and being able to receive proper supplies for life sustaning equipment.

## 2. Plaintiff Bailey

168. Bailey is assigned medical restrictions by Dr. Stanley Allen M.D. John Sealy Orthopedic Specialist. As a measure of safety, John Sealy Orthopedic Pain Clinic recommended Bailey be assigned to a "Single-Level" Medical Unit. See Exhibit E.

169. Bailey is being denied access to outside recreation, educational programs, and the prison library, because all have stairs in order to gain access.

170. Going to and coming from medical chain, officers force Bailey to negotiate stairs. Bailey is prohibited from climbing "any" stairs, including going down stairs.

171. Bailey discusses this situation in detail with defendant Bouchard, which refused to accommodate Bailey.

172. Defendant Bouchard is given personal involvement into all issues in two separate letters dated November 11, 2009, and November 12, 2009 respectively. See Exhibits R & S.

173. Specifically, Bailey mentions the fact that Bailey is being denied access to programs, and services under the ADA Act. Bailey mails the letters in the prison mailbox, Bouchard never responds.

174. Defendant Bouchard intentionally ignored accessibility rights of Bailey under the ADA-RA.

175. On August 28, 2010 Bailey is sitting in the first row of the chowhall where it is marked 'Handicapped Only,' Officer Devon J. Petty asks Bailey where Bailey's caine or crutch is Bailey responds, "I do not have one." Petty utters

something  unintelligible, then Petty asks for Bailey's iden-
tification card.  Bailey  informs  Petty,  Bailey does have
mobility  impairment,  has  trouble walking.  Petty does not
care,  and threatens to write Bailey a disciplinary offense.
Bailey  responds  by  asking  Petty  to  "please"  write  this
disciplinary,  so Bailey can document the denial of Bailey's
disability.  Petty never writes the disciplinary.

176. This  type  of  emotional,  and  mental warfare, is occuring
daily  on  the  Stringfellow  Unit.  Officers  believe  that
inmates must bow to their every whim.  Not true.  The insti-
tution  forbids  an  offender  from  obeying  "any" order by
an  officer that places an offender at risk of harm.  Signed
by  Rick Thaler, Director TDCJ.  See TDCJ Disciplinary Rules
And  Procedures  For  Offenders  ("GR-106") page 28 Rule 24.
See also Offenders Handbook page 23 number 18 that reads:

> "It is the intent of the TDCJ to have all offenders
> immediately comply with lawful instructions or orders.
> An offender will obey the staff' orders at all times,
> as long as the orders do not place him or those around
> him in physical danger ... [i]n such cases, the written
> policy almost always would supersede the direct order."

177. In  relation  to ADA-RA Disabilities, in the Offenders Hand-
book page 2 reads:

> "It is the intent of the [TDCJ] to comply with the
> Americans with Disabilities Act (ADA). Offenders are
> hereby advised of their responsibility to report a
> disability.  ADA related complaints should be addressed
> through the Offender Grievance Procedure.  ADA related
> complaints could also be voiced on an I-60 to the Unit
> Warden."

178. It  is  fact,  that  TDCJ intends to comply with the ADA-RA,
prison  officials  have  direct knowledge of the ADA-RA, yet
defendants  Mossbarger,  Villalobos,  Day, Hodges, and Follins
refuse to accommodate plaintiffs' disabilities.  And;

179. Public  entity  TDCJ  employees,  fail  to  comply with TDCJ

35.